**UNITED STATES of America,**
**Appellee,**

v.

**Andrew RUSSO and Dennis C. Hickey,**
**Defendants–Appellants.**

**Docket Nos. 99–1481(L), 99–1502.**

United States Court of Appeals,
Second Circuit.

Argued: Sept. 25, 2000.

Decided: Aug. 22, 2002.

Herald Price Fahringer, (Erica T. Dubno on the brief), Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP, New York, NY, for Appellant Russo.

John W. Mitchell, New York, NY, for Appellant Hickey.

Daniel S. Dorsky, Assistant United States Attorney (David C. James, Assistant United States Attorney, on the brief), for Loretta E. Lynch, United States Attorney, Eastern District of New York, for Appellee.

Before LEVAL, STRAUB and KATZMANN, Circuit Judges.

LEVAL, Circuit Judge.

Defendants Andrew Russo and Dennis C. Hickey appeal from judgments of the United Stated District Court for the Eastern District of New York (David G. Trager, *J.*) convicting them, after a jury trial, on charges of witness tampering, obstruction of justice, and hindering an investigation by the Federal Bureau of Investigation (FBI), in violation of 18 U.S.C. §§ 1503 and 1512(b)(3). These charges related to an FBI investigation into efforts

to tamper with a juror in violation of the court's order in a prior trial involving the defendant Russo's son, Joseph Russo. (Hereinafter "Russo," without first name, refers to the defendant Andrew Russo.) We affirm.

## BACKGROUND

In early 1994, Russo's son, Joseph, and four others were tried before Judge Charles P. Sifton in the Eastern District of New York on charges of racketeering, murder, and related offenses. The defendants were alleged to be members of the Colombo crime family. The case was known colloquially as the *Persico* case, based on the name of the leader of the Colombo family at the time, Carmine Persico. Pursuant to Judge Sifton's order, the identities of the jurors for the *Persico* trial were kept secret. Judge Sifton's order, issued on February 4, 1994, provided in pertinent part:

The selection of jurors will be made anonymously, that is, without identification of the names or addresses of the jurors or the jurors' employers. The parties, their agents, servants, employees, and all persons in active concert or participation with any of them, who receive actual notice of this order by personal service or otherwise, are directed (1) not to contact or attempt to determine the name, address or identity of any juror without prior leave of this Court and (2) to communicate the contents of this order to any person to whom the contents of any questionnaire is disseminated.

During the trial of the *Persico* case, one of the alternate jurors recognized a spectator, apparently a friend of the defendant Joseph Russo, as Teresa Castranova, with whom the juror had attended elementary school. The alternate juror informed Judge Sifton of her recognition of the spectator; the court did not inform either the government or the defense of the juror's revelation.

Before deliberations began, the alternate jurors were discharged. On April 20, 1994, Joseph Russo and the other defendants were found guilty by the jury. Judge Sifton then discharged the remaining jurors.

In late April or early May 1994, Nicholas Vasile, a private investigator, contacted the mother of the alternate juror. Vasile told her that her daughter had been recognized by someone with whom she had gone to school, and asked to speak with the daughter. He left his business card. The mother refused to provide Vasile with her daughter's address. Upon being informed of these events by her mother, the juror contacted Judge Sifton, who referred the matter to the United States Attorney for investigation.

An agent from the FBI was assigned to investigate the case, and a grand jury was convened. The FBI agent contacted Vasile, who admitted approaching the juror's mother; he claimed he had obtained the juror's name from a man he did not know. The grand jury issued a subpoena for Teresa Castranova's testimony. The assigned FBI agent searched for Castranova for a year, from May 1994 until May 1995, but was unable to find her. The Government subsequently obtained evidence that Defendants Russo and Hickey had arranged to keep Castranova in hiding while the FBI was looking for her.

Eventually, the present indictment was filed. Andrew Russo was charged in Counts One and Two with obstruction of justice and conspiracy to obstruct justice by participating in efforts to contact the juror in violation of the court's order. 18 U.S.C. §§ 1503, 1512. Counts Three and Four charged both Russo and Hickey with

obstruction of justice, in that they caused "Janet Doe" (being Theresa Castranova) to evade the grand jury subpoena, and hindering a government investigation by preventing the communication to law enforcement officers of information relating to the possible commission of a criminal offense, consisting of the efforts to contact the juror in contravention of the court's order.

Prior to trial, the government gave notice that it intended to introduce evidence of the defendants' respective roles in the Colombo family. The defendants moved to preclude this evidence. At a hearing on the matter, the court carefully questioned the government as to the relevance of this evidence. The government argued that without evidence of the defendants' organized crime membership, it would be impossible for the jury to understand their motivations or the conduct of certain government witnesses. The court denied the defendants' motion, stating that it was "reasonably satisfied the government cannot try this case in a credible way without the reference to organized crime." The defendants themselves ultimately introduced a great deal of evidence on organized crime in an effort to discredit the government's witnesses.

The government's case at trial was based largely on the testimony of Russo's mistress, Dorothy Fiorenza, and a Colombo family associate, Mario Parlagreco, who had been incarcerated with both Andrew and Joseph Russo. In addition, the government introduced voluminous transcripts of recorded prison conversations between Andrew Russo, Joseph Russo, and Hickey; letters between Castranova and Joseph and Andrew Russo, and videotape evidence of Andrew Russo and Castranova.

The evidence, briefly summarized, showed that Castranova had been hidden for over a year on a horse farm on Long Island owned by Hickey in order to avoid the FBI subpoena, and that both Russo and Hickey were involved in the plan to keep her concealed from the FBI. For example, when Russo's probation officer paid a surprise visit to the horse farm, Castranova hid under a bed, and Russo helped ensure that she would not be seen. When Castranova's young son asked in the presence of the probation officer where his mother was, Russo falsely told the probation officer that the boy was his nephew. To keep Castranova content during her isolated concealment, Russo provided her with vehicles, while Hickey gave her money and sent new appliances to the farm for her. Russo told Castranova to choose a cover name, and she began using the name "Laurie." She also changed her hair color from blonde to brown. Fiorenza testified that Castranova had told her that the contingency plan, if anything went wrong, was to meet at the Marriott Hotel. When Castranova wanted to visit Joseph Russo, Andrew Russo told her she could not. According to Fiorenza, "Andrew said that [the grand jury investigation] had to be over soon, it couldn't go on for like more than-either a year or six months he said. He thought it was going to be over soon." In addition, Fiorenza, who visited Joseph Russo in jail at Andrew Russo's request and passed messages between father and son, testified that when she reported to Andrew Russo that his son had said there would be trouble because of Hickey, Russo responded "[t]here's a lot of heat out here, [Hickey's] helping us."

The government also presented evidence that Andrew Russo had knowledge of Judge Sifton's order not to contact the jurors. Although Andrew was incarcerated on other charges during Joseph's trial, he communicated regularly with Joseph about the case. Andrew planned the strategy for Joseph's defense; Joseph's attor-

ney was not permitted to make any legal decisions without Andrew's approval. Andrew Russo kept transcripts from the *Persico* trial on Hickey's farm, including the transcript containing Judge Sifton's order prohibiting contact with the jurors. An address book belonging to Andrew had the investigator Vasile's name written on the first page in capital letters, underlined, with Vasile's home phone number. Another of Russo's address books, which was found at Hickey's home, also had Vasile's name and home telephone number written in it. Other evidence supporting the obstruction of justice charges was Fiorenza's testimony that Castranova told her that she had recognized one of the jurors and that a man had been sent to contact the juror. Fiorenza also testified that she passed messages from Joseph Russo to Andrew Russo such as "what is going on with this Dick Tracy," or "ask my father what's going on with this Nick V." Andrew Russo responded, via Fiorenza, "tell him forget it, forget it ... there's too much heat."

In accordance with Judge Trager's denial of the defendants' motion to preclude, the government introduced evidence of the defendants' roles in the Colombo family. Fiorenza testified that Andrew Russo told her that "they" were making him a boss. Parlagreco identified Andrew Russo as a member of the "Colombo gang," and testified that he was "told that [Andrew Russo] was a captain." In addition, Parlagreco testified that Joseph Russo had told him that "Dennis Hickey was with him and his father," that Andrew Russo had told him that "Hickey was with him," and that he overheard Joseph Russo telling a captain of the Lucchese family that "Hickey is over here, with us." Parlagreco explained that to be "with" a member of an organized crime family means that "you are under his umbrella." The government also introduced a tape of an in prison conversation between Andrew and Joseph Russo in which Andrew told Joseph that Hickey is "with you, he's with me, I'm with him."

This evidence of Hickey's association with the Colombo family was corroborated by the extensive evidence of Hickey's elaborate undertakings to serve the Colombo interests, including his allowing Russo to live at his estate and to use it to conduct organized crime meetings, supplying Russo with the use of his vehicles, outfitting the estate with extensive security protections, and, most important, harboring Castranova and her child and keeping her comfortable when the interests of the Colombo family required that she not be available to the FBI.

At the defendants' request, the court charged the jury:

you have heard evidence in this case regarding the defendants' purported affiliation with the Colombo crime family. In this regard, I instruct you that even if you find some or all of the evidence credible, and even if you were to conclude, beyond a reasonable doubt, that one or both of the defendants has an affiliation to the Colombo family, that would be insufficient for you to convict either defendant of any specific crimes with which they have been charged. Rather, in order to convict a defendant of any charge, you must determine that the government has proven, beyond a reasonable doubt, each element of the particular crime you are considering.

Russo and Hickey were convicted on all the charges against them. The third count, which charged both defendants with influencing Castranova to evade legal process in violation of 18 U.S.C. § 1503, was dismissed by the District Court after trial on basis of the ruling of *United States v. Masterpol,* 940 F.2d 760 (2d Cir.1991), that

witness tampering should be prosecuted under 18 U.S.C. § 1512, not 18 U.S.C. § 1503.

Hickey was sentenced to a term of 24 months of imprisonment, three years of supervised release, and a $40,000 fine. Russo was sentenced to 57 months imprisonment and three years of supervised release.

## DISCUSSION

The defendants contend the court erred in admitting the evidence of their involvement in the Colombo organized crime family. They claim, first, that the evidence was irrelevant and prejudicial, and second, that the evidence was inadmissible hearsay, which, under the teaching of *United States v. Gigante*, 166 F.3d 75, 82–83 (2d Cir.1999), did not fall within the hearsay exception for statements of a co-conspirator made in furtherance of the conspiracy.

■ We find no merit in the contention that the evidence of membership in the Colombo family was irrelevant. The evidence was relevant in several ways. The evidence that Hickey belonged to the same Mafia family as Andrew and Joseph Russo, and that Joseph was a captain, explained Hickey's motivation to conceal Castranova. Without this evidence explaining the organized crime affiliation between Hickey, Andrew Russo, Joseph Russo, and the other defendants in the *Persico* trial, Hickey's harboring of Castranova on his farm might have had the appearance of simple hospitality. The jury would not have understood that Hickey had a stake in ensuring that the FBI did not find Castranova. This evidence also explained Andrew and Joseph Russo's readiness to trust Hickey to conceal Castranova from the F.B.I. While Andrew Russo's motivation to seek to contact a juror in the *Persico* trial in violation of the court's order might be attributed to his paternal relationship with

Joseph Russo, his Colombo family relationship to all the *Persico* defendants further explains his motivation in a manner less sympathetic than as a father seeking to protect his child. Furthermore, the defendants' organized crime roles reinforce the credibility of the government witness Fiorenza. Fiorenza's bizarre conduct vis-a-vis the government led defense counsel to paint her to the jury as paranoid, a fool, hysterical, unbalanced, and troubled. The fact of the defendants' organized crime affiliations supported the government's argument that Fiorenza's unorthodox behavior was attributable simply to the fact that she was scared, and should not impeach her credibility. We conclude that for a number of reasons the defendants' affiliation with the Colombo family was highly relevant.

■ The appellants' claim that their convictions should be vacated because the evidence of their Colombo family affiliation was inadmissible hearsay also fails. In the first place, several of the out-of-court statements did not fall within the hearsay rule because they were statements of a defendant offered by the prosecution. Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party. *See* Fed. R.Evid. 801(d)(2)(A). Thus, as to Dorothy Fiorenza's testimony that Andrew Russo told her they were making him a "boss," Parlagreco's testimony that Andrew Russo told him that "Hickey was with him," and Andrew Russo's recorded prison conversations telling his son Joseph that Hickey is "with you, he's with me, I'm with him," these were not hearsay when offered against Andrew Russo. And Hickey made no hearsay objection to them.

As to other statements received, defendants contend that under our ruling in *Gigante,* declarations by non-defendant members of the Colombo family, reported in Parlagreco's testimony, were not admissible under Fed.R.Evid. 801(d)(2)(E) as co-conspirator statements in furtherance of a conspiracy. These included Parlagreco's testimony that he was told Andrew Russo had become a captain, and that Joseph Russo told him (and also told a Lucchese captain) that Dennis Hickey was with the Colombo family. We disagree. Defendants misread our *Gigante* opinion.

In *Gigante,* the district court had admitted a conversation among members of various Mafia families planning to kill one Corky Vastola, and the district court believed this evidence satisfied the co-conspirator-in-furtherance exception to the hearsay rule because of the existence of "a general overriding conspiracy among all of these alleged Mafia groups." 166 F.3d at 83.

We affirmed the conviction but explained that this evidence should have been excluded.[1] *Id.* The defendant was not a part of a conspiracy to murder Vastola. The statements of others made in furtherance of a plan to murder Vastola could not be received against him because he was not a part of such a conspiracy. The fact that the defendant and the declarants were members of a "general overriding conspiracy" constituting the Mafia did not make the statements of others, made in furtherance of this murder, admissible against the defendant. *Id.*

▆▆ Where evidence is offered against a defendant consisting of a declaration by an alleged co-conspirator in furtherance of some criminal act, we explained that the court "in each instance must find the existence [between the defendant and the declarant] of a specific criminal conspiracy [to do that criminal act.]" *Id.* at 82. The "general existence of the Mafia" does not suffice. *Id.* We observed that the district court's expansive rationale "would allow the admission of any statement by any member of the Mafia regarding any criminal behavior of any other member of the Mafia [against the latter]." *Id.* at 83. This was unacceptable when the speaker and the defendant were not jointly engaged in the criminal venture that was being advanced by the speaker.

Seizing on an isolated statement in *Gigante,* taken out of context, defendants interpret the discussion as narrowing the co-conspirator exception, providing that joint membership in a criminal organization can *never* serve as its basis. This misunderstands the nature of the exception and misreads the *Gigante* opinion. *Gigante* did not purport to establish an arbitrary rule excluding conspiracies to operate a criminal organization from eligibility to serve as the basis for the co-conspirator-in-furtherance exception. It merely required that the conditions for the exception be observed. The point of the observation in *Gigante* was that a declarant's statement made in furtherance of a criminal act—a murder in that case—is not admissible against the defendant under the co-conspirator exception unless the defendant was associated with the declarant in a conspiracy or joint venture having that criminal act as its objective. An association between the defendant and the declarant in some other venture—and in particular a general association between them in the Mafia—will not suffice.

---

1. The conviction was affirmed because the inadmissible testimony received was not prejudicial.

■ The co-conspirator-in-furtherance exception [2] has its roots in the law of agency. When two persons engage jointly in a partnership for some criminal objective, the law deems them agents for one another. Each is deemed to have authorized the acts and declarations of the other undertaken to carry out their joint objective. *See Anderson v. United States*, 417 U.S. 211, 218 n. 6, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) ("The rationale for both the hearsay-conspiracy exception and its limitations is the notion that conspirators are partners in crime. As such, the law deems them agents of one another.") (internal citations omitted). *See also* Christopher B. Mueller & Laird C. Kirkpatrick, 4 Federal Evidence § 425, 294 (1994) ("The exception largely builds on agency principles underlying the definition of conspiracy."); LaFave, Scott, Substantive Criminal Law, § 6.4(3) (same); McCormick on Evidence § 259 (5th ed. 1999) ("Conspiracies to commit a crime or an unlawful or tortious act are analogous to partnerships. If A and B are engaged in a conspiracy, the acts and declarations of B occurring while the conspiracy is actually in progress and in furtherance of the design are provable against A, because they are acts for which A is criminally or civilly responsible as a matter of substantive law.")

■ Thus, when two people enter into a joint venture of conspiratorial nature, the actions and utterances of either done in furtherance of that conspiracy are deemed authorized by the other. Where one is a defendant, the declarations of his co-conspirator done in furtherance of the conspiracy formed between them are deemed to be authorized by the defendant and are admissible against him. As the *Gigante* opinion observed, the objective of the joint venture need not be the crime charged in the indictment (or the objective of the conspiracy charged in the indictment). *See Gigante*, 166 F.3d at 82; *see also United States v. Lyles*, 593 F.2d 182, 194 (2d Cir.), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); *United States v. Olweiss*, 138 F.2d 798, 800 (2d Cir.1943) (admission of such declarations "does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal"). Indeed, the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all. *See Fischl v. Armitage*, 128 F.3d 50 (2d Cir.1997) (admitting statements by a corrections officer in prisoner's civil rights action under Section 1983 alleging officers participated in or encouraged assault by other inmates); *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1073–74 (2d Cir.1988) (upholding admission of testimony pursuant to Rule 801(d)(2)(E) in civil antitrust suit); *see also* McCormick, *supra*, at § 259 ("Conspiracies to commit a crime or an unlawful or tortious act ..."); 4 Mueller and Kirkpatrick, *supra*, at § 426 ("The exception can apply even if the proponent does not show that the venture is unlawful."). However, the conspiratorial objective being furthered by the declarant's statement must in fact be the objective of a conspiracy between the defendant and the declarant. Conspiracies between them that do not so

---

**2.** Rule 801(d)(2)(E) provides: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... (E) a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy."

coincide, including a joint association in the Mafia, will not be sufficient.

It does not follow, however, and *Gigante* did not intend, that joint membership in a criminal organization between defendant and declarant can never serve as the basis for the co-conspirator exception. Admissibility depends on the nature of the statement offered—in particular what objective it sought to advance—and whether the defendant was jointly engaged with the declarant in a conspiracy seeking that objective.

The statements at issue here were quite different from the statements discussed in *Gigante*. The *Gigante* statements, as noted, were in furtherance of a planned murder; the defendant Gigante, however, was not involved with the speakers in a conspiracy to commit that murder. We therefore found that the conditions necessary to the exception were not satisfied. The common membership among the speakers and the defendant in the Mafia was not sufficient to justify admission against the defendant of statements of the speakers in furtherance of a murder they planned.

■ Here, in contrast, the defendant and the declarant were involved together in a conspiracy to maintain an organized crime syndicate, and the declarant's statement furthered the maintenance of the syndicate by giving associated persons information about its membership.[3] Such an organization cannot function properly un-less its members and persons who do business with it understand its membership, leadership and structure. The operation of such a syndicate requires that information be passed among interested persons, advising them of the membership and the hierarchy. Joseph Russo's statements quoted by Parlagreco, identifying Hickey as being with the Colombo group, were of that nature. They furthered a conspiratorial objective in which Russo and Hickey were jointly engaged with Joseph Russo—the objective of informing members of the Colombo family concerning the identities of persons affiliated with the family. *See, e.g., United States v. Persico,* 832 F.2d 705, 716 (2d Cir.1987) (statements "regarding the activities of the [organized crime] enterprise and the various roles of appellants in it clearly were in furtherance of the enterprise"); *id.* at 708 (noting that government introduced evidence delineating the organizational structure of the Colombo family); *United States v. Rahme,* 813 F.2d 31, 36–37 (2d Cir.1987) (statements designed to reassure a co-conspirator, maintain trust and cohesiveness among them, or inform each other of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)); *cf. United States v. Roldan–Zapata,* 916 F.2d 795, 803 (2d Cir. 1990) (where co-defendant told a potential drug purchaser that the defendant was "El Jefe"—"the boss"—that statement was admissible as a · co-conspirator statement

---

[3]. The statements quoted by Parlagreco were not made in furtherance of a particular criminal act and were not made in furtherance of the conspiracy that was the subject of the trial. *See Gigante,* 166 F.3d at 81 ("The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment."); *Lyles,* 593 F.2d at 194 ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment"); *Olweiss,* 138 F.2d at 800 (admission of such declarations "does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal"). In making the statements, Joseph Russo was not furthering the objective of concealing Castranova from the FBI. He was furthering a conspiracy to operate the Colombo family, a conspiracy in which he was involved with Andrew Russo and Hickey.

since it "furthered the conspiracy's purposes by informing [the purchaser] of the identity and role of [the defendant] and reassuring him to proceed with the transaction in the presence of someone with whom he was not familiar"). One of the objectives that members of a criminal organization share as co-conspirators is the transmission of information regarding the organization's membership. Because the hearsay statements at issue in this case furthered this objective, the requirements of Rule 801(d)(2)(E) were met, and the limitations described in our *Gigante* opinion were not violated.

Furthermore, because the evidence here received is only of membership or structure of an organization, and does not identify a defendant as participating in a crime charged, the use of the co-conspirator exception to the hearsay rule in such circumstances does not cause the problem we noted in *Gigante*—the use of hearsay to identify a person as a participant in a crime justified solely by the declarant's membership together with the defendant in a criminal organization. 166 F.3d at 83.

▮▮▮ We now turn to some of defendants' other contentions. Defendants argue that the government made prejudicial references to the defendants as "powerful gangsters," "mafioso," "mob boss," in opening and closing statements. Defendants did not raise any contemporaneous objections to these remarks. Defendants contend that they need not have done so where the court denied defendants' in limine motion regarding introducing evidence of their participation in organized crime. But the pretrial ruling was on the relevance of the evidence of Mafia membership—not on the use of prejudicial language. The objection now being made to the use of colorful, prejudicial terminology is of a different nature. This objection is being raised on appeal for the first time.

In the absence of a timely objection at trial, defendant must show that the statements were so substantially prejudicial as to constitute "flagrant abuse." *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir.1998). We find no such abuse. *See also United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir.1993) (finding no error where the prosecutor repeatedly called defendant a "drug dealer" and an "experienced drug dealer").

▮▮▮ Defendants also object to the court's jury instruction on intent, contending that the court erred by telling the jury it "may infer that a person ordinarily intends all the natural and probable consequences of an act knowingly done." In *Sandstrom v. Montana*, 442 U.S. 510, 512, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court ruled that an instruction stating that "the law presumes that a person intends the ordinary consequences of his voluntary acts," violated the Fourteenth Amendment requirement that the state prove each element of the criminal offense beyond a reasonable doubt. However, "you may infer" language is significantly different from the "law presumes" language in *Sandstrom*. "You may infer" language may pose no constitutional problem where in context it suggests to the jury only a permissible inference. *See Francis v. Franklin*, 471 U.S. 307, 314–15, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). Once again, the defendants raised no objection during the charging conference, nor did they take exception following the charge. In the absence of an objection, such instructions are reviewed only for plain error. We look to the context of the charge as a whole to evaluate whether there was prejudice. *United States v. Allah*, 130 F.3d 33, 42 (2d Cir.1997). In context, we find no error, especially given that the trial court instructed the jury first that "each defendant is to be presumed by you

to be innocent throughout your deliberations," and repeatedly instructed the jury on the government's burden of proof beyond a reasonable doubt as to each element of each offense.

We find the defendants' other arguments to be without merit.

## CONCLUSION

The judgments of conviction are affirmed.