UNITED STATES of America,

v.

Samuel SANEAUX and Rafael Estrella, Defendants.

No. S2 03 Cr. 781(CSH).

United States District Court, S.D. New York.

April 18, 2005.

---

Gustavo L. Vila, Kuczinski Vila & Associates, Michael F. Dailey, Kuczinski, Vila, Tarallo, Pillinger & Miller, LLP, Elmsford, NY, Robert J. Lunney, Lunney & Murtagh, LLC, White Plains, NY, Victor G. Daly–Rivera, Bronx, NY, Jeffrey G. Pittell, Great Neck, NY, John Francis Kaley, Doar Rieck & Mack, New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

·Presently before the Court are the *in limine* motions of defendants Samuel Saneaux and Rafael Estrella to preclude certain evidence expected to be offered by the government at trial. Defendants argue that transcripts of recordings of an unindicted coconspirator who is unavailable to testify constitute hearsay evidence and do not fall within the hearsay exemption for statements of coconspirators contained in Rule 801(d)(2)(E) of the Federal Rules of Evidence. In an opinion dated April 4, 2005,[1] I required the parties to address what was principally a procedural question: namely whether this Court should adjudicate defendants' motion prior to trial or whether it was preferable to follow what I called the "*Geaney* protocol" and admit the contested statements subject to connection at trial. *See United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied sub nom. Lynch v. United States*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). Hearings were held on this question on Wednesday, April 6, 2005.

### I. Background

Though I assume familiarity with *Saneaux I,* I will briefly revisit the relevant facts in order to provide context for this Opinion. The Second Superceding Indictment in the above-captioned case charges *inter alia* that the defendants, in concert with other unindicted conspirators, conspired to solicit and accept bribes in order to secure individuals an apartment in Andrews Plaza, a federally subsidized housing project located in the Bronx. There

---

1. *United States v. Saneaux*, No. S2 03 Cr. 781 (CSH), 365 F.Supp.2d 488, 2005 WL 756857 (S.D.N.Y. April 4, 2005) (*"Saneaux I"*)

was, not surprisingly, a significant waiting list for subsidized apartments in Andrews Plaza. According to the indictment, the bribes were paid to defendants in order to advance prospective tenants to the front of the list, enabling them to bypass the wait. Specifically, defendant Saneaux, the former "site manager" of Andrews Plaza, is alleged to have employed the services of Andrews Plaza tenants, including defendant Estrella, to act as the intermediaries between the prospective tenants and Saneaux himself. Bribes were allegedly paid to the intermediaries [2] who passed the money to Saneaux, who allegedly used his position as site manager to manipulate the waiting list to provide the bribe-payers with apartments in Andrews Plaza.

Another intermediary between prospective tenants and Saneaux is alleged to be an individual by the name of Robert Grullon.[3] Between August 2001 and December 2002, federal investigators recorded a series of conversations between Grullon, "Christian," a confidential informant ("CI"), and "Rosa Rodriguez," an undercover federal agent. The recordings depict Christian and Rodriguez engaging in a series of negotiations with Grullon to secure themselves an apartment in Andrews Plaza, through the payment of a bribe. It is the admission of these transcripts which forms the grist for defendants' motions. Defendants claim that Grullon's statements do not qualify as statements of coconspirators under Rule 801(d)(2)(E) because they were not made in furtherance of a conspiracy. Because he later acknowledged that he never intended to secure the CI and Rodriguez an apartment, and likely would not have been able to secure them an apartment, defendants contend that Grullon's recorded statements were not made to advance the goals of the conspiracy alleged in the indictment, or indeed any conspiracy, and should be precluded. According to defendants, Grullon made these statements as part of his own independent and solitary attempt to steal the money offered by the CI and Rodriguez and intended to serve as a bribe.

## II. Discussion

### A. Federal Rule of Evidence 801(d)(2)(E)

The government seeks to admit these transcripts under Rule 801(d)(2)(E) of the Federal Rules of Evidence, which provides in pertinent part:

> (d) Statements which are not hearsay. A statement is not hearsay if—
>
> . . .
>
> (2) [t]he statement is offered against a party and is . . . (E) a statement made by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

"Before[4] admitting a co-conspirator's statement over an objection that it does not

---

2. Some bribes were allegedly paid directly to Saneaux.

3. Grullon, an unindicted coconspirator, is unavailable to testify as a witness.

4. I note, simply in passing, that although *Bourjaily* has not actually altered the Second Circuit's practice of following the *Geaney* protocol and admitting 801(d)(2)(E) statements

subject to connection, the Supreme Court's use of the term "[b]efore," implies a temporal imperative in making such disposition. *See infra* Part II.B. In other words, the plain text of *Bourjaily* supports the procedural mechanism employed by the Fifth Circuit: namely determining the admissibility of an 801(d)(2)(E) statement *before* the admission of such a statement. Because I conclude that in

qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule." *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (emphasis added).

 In order to admit a statement under 801(d)(2)(E), "a court must find (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of *and* (b) in furtherance of the conspiracy." *United States v. Tracy,* 12 F.3d 1186, 1196 (2d Cir.1993) (emphasis added). These prerequisites to admission of an 801(d)(2)(E) statement are "[p]reliminary questions concerning ... the admissibility of evidence" as referenced in Fed.R.Evid. 104(a), and must be proven by a preponderance of the evidence. *Bourjaily,* 483 U.S. at 176, 107 S.Ct. 2775; *United States v. Daly,* 842 F.2d 1380, 1386 (2d Cir.1988) *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). The court may consider the hearsay statements themselves, but "these statements are presumptively unreliable, and, for such statements to be admissible, there must be some independent corroboration of the defendant's participation in the conspiracy." *United States v. Diaz,* 176 F.3d 52, 83 (2d Cir.1999) (citing *United States v. Tellier,* 83 F.3d 578, 580 (2d Cir.1996)).

### B. *Saneaux I and the Geaney Protocol*

While the foregoing discussion addresses the substance of the Court's preliminary obligations concerning the admission of an 801(d)(2)(E) statement, it does not concern the procedural facets of such adjudication. To wit, when, or at what point in the evolution of a case should the court adjudicate defendants' motion to preclude the government's evidence? This was the subject of the *Saneaux I* Opinion and the hearing it compelled. As I observed in *Saneaux I,* in this circuit, "trial judges routinely admit[ ] coconspirator statements into evidence in the presence of the jury on a conditional basis, subject to the later submission of the necessary evidence." *Saneaux I,* 365 F.Supp.2d at 490, 2005 WL 756857, at *2. I refer to this approach as the *Geaney* protocol, invoking Judge Friendly's opinion in *United States v. Geaney,* which established this procedure. 417 F.2d at 1120. However, I also noted that other circuits prefer to "first hold a hearing outside the presence of the jury to determine whether the party offering the statements has established the existence of a conspiracy by a preponderance of the evidence." *Saneaux I,* 365 F.Supp.2d at 491, 2005 WL 756857, at *3 (citing *United States v. James,* 590 F.2d 575 (5th Cir. 1979)). This is commonly referred to as a 'James hearing' invoking the Fifth Circuit's 1979 decision. In *Saneaux I,* I required the parties to discuss what procedure was most appropriate for adjudication of defendants' motion in the case at bar.

During arguments held before the Court on April 6, 2005, neither the government nor the defendants suggested that I hold a *James* hearing. This did not mean, however, that the parties agreed on the proper adjudicative process. Not surprisingly, the government argued that the best course would be to follow the *Geaney* protocol and abstain from ruling on the defendants' *in limine* motions, allowing the recorded statements to be admitted at trial but subject to connection. The defendants, on the other hand, argued that sufficient evidence existed in the parties' submissions to support a ruling to preclude this evidence. Within the four corners of

the circumstances of this case the government must prove the 801(d)(2)(E) factual prerequisites at trial, but prior to admission of Grullon's statements, this question does not arise.

the parties submissions, according to defendants, the evidence demonstrates unequivocally that Grullon's hearsay statements were not made "in furtherance" of a conspiracy. The defendants' arguments have considerable force. I have difficulty in fathoming an interpretation of Grullon's statements which could support the government's position that those statements were made *in furtherance of* any conspiracy.

C. *Preliminary Requirements for Admission of an 801(d)(2)(E) Statement*

As I describe above, there are three preliminary requirements for a hearsay statement to be admitted pursuant to the coconspirator exemption in Rule 801(d)(2)(E); each of which must be proven by a preponderance of the evidence. First, there must be a conspiracy. Second, both the declarant and the defendants must be part of that conspiracy. And third, the statements must be made *both* during the course of *and in furtherance of* that conspiracy. The careful reader will surely notice that this final requirement is really two discreet requirements, each of which warrants its own independent analysis.

■ As a preliminary matter, it is evident that, at least for the limited purposes of this Rule 104(a) disposition, it is only the existence *vel non* of the third prong which is in dispute. While the defendants certainly do not concede that there was a conspiracy of which both declarant and defendants were members, they recognize, appropriately I think, that the government possesses certain evidence which tends to establish these first two preliminary requirements.[5] I address the third require-

---

5. First, the statements themselves—which may properly be considered as evidence pursuant to *Bourjaily* and the Notes of the Advisory Committee to the 1997 amendment of FRE 801(d)(2)(E)—support the government's contention that Grullon was working with the "manager" of the Andrews Plaza apartments to illegally sell apartments. *See, e.g.*, Draft Wiretap Transcripts, GX 128–T, at 4 (Grullon refers to his coconspirator as "the one in charge, the manager."); *Id.* at 12 ("He is the manager down there."). While the transcripts never elucidate who the "manager" is or whether the content of the statement is actually true, it remains relevant evidence. Further, the government represents on this motion that it intends to call at trial witnesses who will testify that they paid money to Grullon, Estrella, and others in exchange for assistance in getting an apartment. Some witnesses will also apparently testify that they paid Saneaux directly and others that they paid money to an intermediary such as defendant Estrella, Grullon, Ernesto Rodriguez or Lucia Rodriguez, the latter two being additional unindicted coconspirators. Finally, Grullon's proffer statements themselves contain significant evidence of a conspiracy of which at least Saneaux was a member. After the Supreme Court's opinion in *Crawford v. Washington*, these testimonial statements can-

not be admitted by the government itself, however, it is possible that the defendants will seek to introduce these proffers in order to impeach Grullon, which would open the door for the government to introduce other evidence of the conspiracy contained within the statements under the rule of completeness (but subject to the Rule 403 balancing). 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), *abrogating Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Moreover, and perhaps more importantly, because the Court is not bound by the Rules of Evidence in the disposition of preliminary matters such as this one, I may properly consider such evidence even if it cannot be introduced at trial. Fed.R.Evid. 104(a) ("In making its determination, it is not bound by the rules of evidence except those with respect to privileges."); Fed.R.Evid. 1101(d)(1) (evidence rules inapplicable to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104"); *see also United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *United States v. Yousef*, 327 F.3d 56,

ment—and more precisely, the second prong of the third requirement—because of the present lack of evidence supporting the government's contention that Grullon's recorded statements were made in furtherance of a conspiracy.

### 1. Statements Made "During the Course of" A Conspiracy

■ The third preliminary requirement provides first that the hearsay statement must be made *during the course of* a conspiracy. This is best described as a temporal requirement. That is to say the statements cannot be made after the cessation of the conspiracy or before its formation. *See United States v. Grossman,* 843 F.2d 78, 83 (2d Cir.1988); *United States v. DeVaugn,* 579 F.2d 225, 227 (2d Cir.1978); *see also* 29A Am.Jur. 2d *Evidence* § 837 (2004) ("[T]here must be a showing that the statements or acts of the coconspirator were made while the conspiracy was active, that is after it was formed and before it ended.") This requirement "protect[s] against the use of unreliable evidence, since the circumstances in which the statement is made-prior to detection ... tend[s] to assure the reliability of the declarant and the accuracy of the statement." *United States v. Puco,* 476 F.2d 1099, 1109 (2d Cir.1973).

Because a more complete understanding of the parameters of a statement made *during the course of* a conspiracy may shed light upon the circumstances in which a statement is made *in furtherance of* a conspiracy, I will briefly discuss the evidence that supports the government's assertion that Grullon's statements were made during the time-frame in which the conspiracy is alleged to have been active. The recordings containing Grullon's state-

ments were made between August 2001 and December 2002. The superceding indictment avers that the conspiracy was active "[f]rom at least in or about 1995 up to and including at least in or about February 2003." Superceding Indictment, *in* Defendant Saneaux's Motion *In Limine,* Ex. F. Further, the indictment asserts that "[i]n or about July 2001," defendants Saneaux and Estrella solicited and received "a thing of value," namely "$4,000 in return for assistance in obtaining a federally subsidized apartment at the Andrew's [sic] Plaza Housing Project." *Id.* at 3. Though it is not clear when, if ever, that money yielded an apartment to the bribe-payer, alleged to be Marcia Gil (a proposed testifying witness), it is clear from the indictment that the alleged attempted concealment of the conspiracy continued through December 2003. If proven by the government at trial, this evidence tends to indicate that Grullon's statements were made during the same time-frame as the alleged conspiracy, or during the course of that conspiracy. Once again, I caution that these observations should not be interpreted as a ruling by the Court that the government has successfully proven these prerequisites; all such rulings are reserved to the trial. *See supra* n. 5.

### 2. Statements Made "In Furtherance Of" A Conspiracy

The final preliminary requirement for the admission of a coconspirator's statement is that the statement be made in furtherance of a conspiracy. It is this requirement which forms the core issue in the case at bar. Defendants contend that because Grullon later admitted that he *never* intended to get Christian (the CI) and Rodruiguez (the undercover agent) an

145 (2d Cir.2003) (same). But these reflections should not be interpreted as a ruling by the Court *at this time* that the government has

proved these prerequisites to admissibility by a preponderance of the evidence. All such rulings are reserved to the trial.

apartment, but rather intended to keep the bribe money, the statements he made during that transaction could not possibly have been made in furtherance of the conspiracy involving defendants. Rather, they were statements made by Grullon in support of his solitary endeavor, the object of which was to obtain bribe money and convert it to his personal use.[6] I approach this analysis wary of the Second Circuit's warning that the determination of whether or not a statement was made in furtherance of a conspiracy, threatens to ensnare the court in a "troublesome thicket." *Headley v. Tilghman*, 53 F.3d 472, 476 (2d Cir.1995).

The coconspirator exemption to the hearsay rule contained in FRE 801(d)(2)(E) is grounded in agency theory.

[W]hen two people enter into a joint venture of conspiratorial nature, the actions and utterances of either done in furtherance of that conspiracy are deemed authorized by the other. Where one is a defendant, the declarations of his co-conspirator done in furtherance of the conspiracy formed between them are deemed to be authorized by the defendant and are admissible against him.

*United States v. Russo*, 302 F.3d 37, 45–46 (2d Cir.2002); *see also Anderson v. United States*, 417 U.S. 211, 218 n. 6, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) ("The rationale for both the hearsay-conspiracy exception [sic] and its limitations is the notion that conspirators are partners in crime. As such the law deems them agents of one another."); *United States v. Olweiss*, 138 F.2d 798, 800 (2d Cir.1943) (noting that the hearsay exemption is based on "the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal").

■ To fall within the hearsay exemption, "the conspiratorial objective being furthered by the declarant's statement *must in fact be the objective of a conspiracy between the defendant and the declarant.*" *Russo*, 302 F.3d at 45 (emphasis added). "[T]he statements must in some way have been designed to *promote or facilitate achievement of the goals of the ongoing conspiracy ....*" *United States v. Diaz*, 176 F.3d 52, 85 (2d Cir.1999) (citing *Tracy*, 12 F.3d at 1196) (emphasis added); *United States v. Smalls*, 131 F.3d 132 (2d Cir.1997); *Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir.1996); *United States v. Gambino*, 101 F.3d 683 (2d Cir.1996). "[C]ommunicating with a person who is not a member of the conspiracy *in a way that is designed to help the coconspirators to achieve the conspiracy's goals* is also in furtherance of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir.1994) (emphasis added).

The touchstone of the "in furtherance" requirement is that the statement be designed to promote the accomplishment of the conspiracy's goals.[7] "The principal

---

**6.** Neither a confidential informant working with law enforcement nor an undercover law enforcement agent can be regarded in law as a member of a criminal conspiracy.

**7.** Examples of cases describing those statements that are considered in furtherance of a conspiracy include, *United States v. Mulder*, 273 F.3d 91, 103 (2d Cir.2001) ("[S]tatements between coconspirators that ... inform each other as to the progress or status of the conspiracy do further the conspiracy."); *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d

83, 88 (2d Cir.1999) ("The statements must prompt the listener to respond in a way that promotes or facilitates the carrying out of a criminal activity.") (citing *United States v. Maldonado–Rivera*, 922 F.2d 934, 958–59 (2d Cir.1990)); *United States v. Desena*, 260 F.3d 150, 158 (2d Cir.2001); *United States v. Sanin*, 113 F.3d 1230 (2d.Cir.1997) ("[E]fforts to recruit [parties] into the conspiracy [are] 'in furtherance' of the conspiracy because they are intended to achieve the conspiracy's

question in the 'in furtherance' issue is whether the statement promoted, or was intended to promote, the goals of the conspiracy." *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1199 (2d Cir. 1989). Statements which tend to *frustrate or hinder* the goals of the conspiracy, or those which cannot conceivably be interpreted to advance the accomplishment of conspiracy objectives, cannot reasonably be interpreted to further that conspiracy.

■ Moreover, it is worth noting that while a statement made in furtherance of a conspiracy *a fortiori* is made during the course of that conspiracy, the converse is demonstrably untrue. It does not follow that solely because a statement is made during the course of a conspiracy that statement was also in furtherance of that conspiracy. When courts find that a statement is made in furtherance of a conspiracy, they often omit an independent analysis of whether that statement was also made in the course of that conspiracy, since the former conclusion subsumes the latter. However, the case at bar illustrates the independence of these two requirements.

■ The principal basis for my concern in this case is that the government cannot plausibly claim that Grullon's recorded statements were made in furtherance of a conspiracy in light of Grullon's two proffer statements, made as part of his then-existing cooperation agreement with the government. Following an investigation—which yielded the recordings, the transcripts of which are at issue here—Robert Grullon was arrested in early 2003. According to the government's interview memoranda, Grullon participated in two proffer sessions, one on February 6, 2003 and the other on February 12, 2003 (the reports are dated February 20 and 24,

respectively). Therein, Grullon made a series of admissions which inculpated himself and defendant Saneaux, and described in detail multiple transactions in which he contends that he helped Saneaux sell apartments to prospective tenants. Specifically, Grullon acknowledges trying unsuccessfully to sell apartments between 1996/1997 and 2000. Beginning in 2000, Grullon describes eight different sales of apartments in Andrews Plaza, including the amount allegedly paid to Saneaux and the amount Saneaux allegedly remitted to Grullon as a finders fee. However, Grullon also describes his interactions with Christian and Rodriguez, apparently unaware that his conversations were recorded or that these particular "prospective tenants" were actually a government informant and undercover agent.

> Grullon stated that there were 2 people that he could not get them apartments [sic]. Grullon said a person by the name of Christian [CI] came to him looking for an apartment. Grullon said that in approximately April 2002, Christian gave him a $1,500 deposit for an apartment. *Grullon stated that he knew all along he would not be able to get Christian an apartment* because Christian was recommended by Yvonne Cuevas, an enemy of Sammy and Sammy had stopped selling apartments. . . .

Memorandum of Interview of February 6, 2003, *in* Defendant Saneaux's Motion *In Limine,* Ex. A. In his proffer statement of February 12, Grullon "revealed that he never gave the money for Christian to Saneaux because Christian was a friend of Yvonne Cuevas." Memorandum of Interview of February 12, 2003, *in* Defendant Saneaux's Motion *In Limine,* Ex. B.

If Grullon took the money from Christian "kn[owing] all along he would not be

goals."); *United States v. Amato,* 15 F.3d 230, 234 (2d Cir.1994).

able to get Christian an apartment" and consequently, "never gave the money for Christian to Saneaux," it is difficult to see how the statements he made during this transaction "promoted, or was intended to promote, the goals of the conspiracy." *Beech–Nut Nutrition Corp.*, 871 F.2d at 1199. In fact, if Grullon never intended to get Christian an apartment, but rather planned to convert it for his personal use, his statements actually serve only to hinder or defeat the conspiracy. I do not think I step too far outside of my area of experience in observing that stealing a customer's money and not providing them the product they seek to purchase is bad for business, licit or illicit.

The evidence in the wiretap transcripts themselves also support this interpretation of Grullon's actions and intentions. First, Grullon never mentions Saneaux by name. He never allows Christian or Rodriguez to speak with Saneaux. In one recording where Christian attempts to contact Saneaux directly, Saneaux appears to have no idea about the transaction. Draft Wiretap Transcripts, GX 107–T, at 4 ("CI: So I was trying to get in contact with him because ... He and I.... He was going to ... He was going to get me an apartment, but then he changed his phone number. Saneaux: Really? I haven't seen Robert in a while. CI: Excuse me? Saneaux: I haven't seen Robert in a while. CI: Are you looking for Robert? Saneaux: I haven't seen Robert in a long time. I don't know what to tell you. CI: Oh! Saneaux: I didn't know he was involved in that.") (ellipses in original, indicating pause in conversation). Further, Grullon is never able to secure an apartment for Christian and Rodriguez.

The evidence presently before the court points unfailingly towards the interpretation of Grullon's recorded statements offered by the defendants: his statements were intended to advance a unilateral and independent venture which had as its purpose the theft of money intended by the payee as bribes for apartments at the Andrews Plaza complex. His statements, and the transaction which is the subject of the recordings, really serve only to *hinder* the conspiracy insofar as stealing money from hopeful apartment-seekers would be bad for business.[8]

The government's response is rife with chaff and wanting in wheat. To the specific question of whether Grullon's statements were made in furtherance of a conspiracy, the government offers the following two arguments. First, the government indirectly attempts to discredit the accuracy of Grullon's proffer statements. The government does not assert directly that Grullon lied about his intentions with respect to the Christian/Rodriguez transaction, but simply claims that the prosecutors have "learned about additional information that undermines his veracity." Government's Memorandum in Opposition, p. 5 n. 1. I

---

8. The Court and counsel have had time to carefully consider and argue the issues presented by these circumstances because the government gave defendants' counsel copies of Grullon's proffer statements prior to the weekend before the trial was to start (the trial was then postponed for unrelated reasons). The government properly regarded Grullon's proffer statements as material it was required to disclose to the defense under the Jencks Act, 18 U.S.C. § 3500. While the statute does not mandate that disclosure until "[a]fter a witness called by the United States has testified on direct examination" [here by recorded statements], it is the salutary practice of the Office of the United States Attorney for this District to make § 3500 material available before the witness testifies. That practice, whose effect is to facilitate the fairness of the trial process, was particularly beneficial in this case, and I take this opportunity to praise the Office in general and these Assistants in particular.

accept that Grullon may not be the most trustworthy of witnesses. However, it is simply untenable for the government to claim that Grullon's proffer statements are largely true, insofar as he details a series of criminal acts inculpating himself, Saneaux, and others (but exculpating no one), but untrue insofar as he really did intend to secure an apartment in the Christian/Rodriguez transaction, another statement with no exculpatory value. I can discern no incentive for Grullon to lie on that particular score.

Second, the government claims that "Grullon's proffer statements merely indicate that, as a diligent member of the conspiracy, he took money whenever it was offered, but did not deliver it to his boss in this instance because he believed his boss would be ill-disposed to the payer." *Id.* If the government has any evidence that during any point in the Christian/Rodriguez transaction, Grullon spoke with Saneaux about the apartment, or otherwise actually attempted to secure an apartment, it has not presented it to the Court. What has been presented, in the form of the government's own memoranda of interviews with Grullon, is his repeated insistence that he *never* intended to get an apartment for Christian or Rodriguez. As described in defendant's Saneaux's motion papers, the current state of the government's evidence indicates that Grullon "took money whenever if was offered, utilizing whatever deceit was called for, and did not deliver it to his boss in the conspiracy he may otherwise have been a party to because in this

instance, it [delivering the money to his boss] wouldn't have advanced his sole objective of 'ripping-off' his payer." Defendant Saneaux's Motion *In Limine*, p. 7.

### III. Conclusion

Given the present state of the record revealed by defendants' motions *in limine*, I reach the following conclusions and make the following directions with respect to the admissibility of the recorded out-of-court declarations by Robert Grullon.

1. The present record makes it plain that the government has yet to produce or proffer proof sufficient to show by a preponderance of the evidence that Grullon's recorded declarations were in furtherance of the conspiracy alleged in the indictment.[9]

■ 2. Nonetheless, I am cognizant that additional relevant evidence may be offered by the government at trial. And I agree with the government's contention that the Court ought to decide the issue in light of all the evidence adduced at trial. Consequently I decline to hold at this time, as defendants ask me to do, that the recorded Grullon declarations are inadmissible at trial. Rather, I will adhere to the procedure sanctioned by such Second Circuit cases as *Geaney* and *Tracy* and allow the government the opportunity to offer additional evidence at trial bearing upon the issue.[10]

3. However, the present paucity of the government's proof on the in furtherance issue requires that, in the interest of fair-

9. While under the *Bourjaily* case I may consider the contents of the Grullon declarations on this issue, as noted in text *supra* they fall well short of demonstrating that they were made in furtherance of the charged conspiracy.

10. I will also adhere to the near uniform practice of district judges in this circuit and refrain from requiring the government to of-

fer this proof in a pre-trial evidentiary hearing, under Rule 104(a), Fed.R.Evid., or otherwise. Nor do counsel for the defendants at bar ask me to conduct such a hearing; their contention, as stated in text, is that defendants' motion to preclude the Grullon declarations should be granted on the basis of the present written submissions.

ness, the traditional *Geaney* protocol be departed from in one respect. I will not allow the jury to hear the recorded Grullon declarations "subject to connection" though the medium of subsequently offered evidence. Rather, the government is directed to elicit and place before the jury all the evidence it will rely upon to satisfy all prerequisites of admissibility, including the "in furtherance" requirement, so that I may hear counsel argue the issue and rule upon the admissibility of the recorded Grullon declarations before those declarations are placed before the jury. This may require the government to alter its preferred order of proof, but the situation is essentially one of the prosecutors' own making (I do not say that in criticism) and the justice of the cause requires this procedure. By that I mean that in the circumstances of this case, I am not willing to have the jury hear the Grullon declarations early in the government's case and then, if the requisite proof on admissibility is not forthcoming thereafter, having to choose between instructing the jury to for-

get rather dramatic statements that they heard several days earlier [11] or declare a mistrial, those being the only options conferred upon trial judges by *Tracy*, 12 F.3d at 1199.

4. It follows from the foregoing that the government is directed not to refer to the recorded Grullon declarations, directly or indirectly, when making its opening statement to the jury.[12]

5. I have been careful to limit the effect of this Order to Grullon's *recorded* statements. In its letter brief at 6 the government signals its intention to offer under Rule 801(d)(2)(E) other coconspirator declarations, which include "non-recorded statements of Robert Grullon as well as statements of other coconspirators such as, *inter alia*, Lucia Rodriguez and Ernesto Gonzalez," who were involved in one way or another with the apartment-bribery conspiracy. So far as one can presently tell these other, non-recorded statements are not complicated by the indications in Grullon's proffer statements that the particular transaction regarding

11. I recognize the understandable inclination of judges, trial and appellate, to state (as they frequently do) that conscientious jurors may be relied upon to obey a trial judge's limiting instructions. However, in the case at bar I think the better course is to avoid entirely a need for reliance.

12. It is useful to note that this opinion and order, which deal principally with the hearsay rule and the admissibility of a coconspirator's out-of-court declarations, have nothing to do with Count Three of the superseding indictment, against Estrella alone, which charges that Estrella "persuaded and attempted to persuade a witness to recant statements to law enforcement officers in order to hinder the prosecution of the bribery conspiracy" charged in the earlier Counts. This conduct, if proved, would constitute a violation of 18 U.S.C. § 1512(b)(3), which provides that a person who "knowingly ... persuades another person, or attempts to do so, with intent to ... hinder, delay, or prevent the communica-

tion to a law enforcement officer ... of information relating to the commission of possible commission of a Federal offense ..." is guilty of a felony bearing a maximum sentence of ten years imprisonment. The government says in its letter brief at 2: "After his arrest, however, Estrella committed another federal crime. Beginning in or about April 2003, Estrella approached Marcia Gil, one of the individuals from whom he had collected a bribe, and persuaded Gil to recant statements she made to the Government inculpating Saneaux and Estrella. Hence, Estrella has been charged with witness tampering as well as the bribery-related charges." The government's principal proof against Estrella on this charge will presumably be the in-court testimony of Gil. Estrella's out-of-court declarations to Gil, as described by Gil, would not be hearsay because they are "offered against a party" and are "the party's own statement [{s]," Rule 801(d)(2)(A), Fed.R.Evid.; the admissibility questions surrounding a coconspirator's out-of-court statements do not arise.

the particular apartment referred to in the recorded statements fell outside the parameters of the charged conspiracy. These non-recorded declarations will accordingly be subjected to the traditional *Geaney* protocol, rather than the *Geaney* procedures I will follow with respect to Grullon's recorded declarations, as described in the preceding paragraphs of Part III.

I record herewith the government's representations at the April 6, 2005 hearing that there will be no proof offered at trial with respect to Saneaux's laptop computer and no statements offered that might implicate the exclusionary rule of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Lastly, I deny the defendants' motion to exclude evidence that Saneaux received an apartment-related bribe in 1995, eight years before the date of the indictment. This evidence is admissible to prove an overt act in furtherance of the charged conspiracy. It is of no moment that this conduct falls outside the five-year statute of limitations for conspiracies. It is well settled that a conspiracy charge is timely filed if only one of a number of overt acts occurred within five years of the indictment; inherent in that rule is the government's ability to plead and prove earlier overt acts. If a limiting instruction is requested when the time comes, I will consider the matter.

All the foregoing is SO ORDERED.