22-2527-cr (L)
*United States v. Torres*

# In the
# United States Court of Appeals
# For the Second Circuit

————

August Term 2023
Nos. 22-2527-cr (L), 22-2652-cr (CON), 22-2976 (CON)

UNITED STATES OF AMERICA,
*Appellee,*

v.

RANDY TORRES, AKA RICO, WALSTON OWEN, CHARLES VENTURA,
*Defendants-Appellants.*[*]

————

ARGUED: MAY 10, 2024
DECIDED: DECEMBER 20, 2024

————

Before: CABRANES, PARKER, and KAHN, *Circuit Judges.*

————

      Randy Torres, Walston Owen, and Charles Ventura appeal from judgments of the United States District Court for the Southern District of New York (Victor Marrero, *J.*) convicting them of offenses related to their involvement in a street gang known as the Rollin' 30s Crips.  Following a jury trial, all three were found guilty of racketeering conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (Count One).  In addition, Owen was convicted of assault and attempted murder in aid of racketeering, 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and 2 (Count Two); unlawful use

———————————————————

[*] The Clerk of Court is respectfully directed to amend the official caption as displayed above.

of a firearm "during and in relation to a crime of violence," in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three); and assault in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(3) and 2 (Count Four). Ventura too was convicted of assault and attempted murder in aid of racketeering (Count Five) and unlawful use of a firearm "during and in relation to a crime of violence" (Count Six), as well as possession of a firearm following a felony conviction, in violation of 18 U.S.C. § 922(g)(1) (Count Seven). Torres and Owens were sentenced to aggregate terms of 475 months' imprisonment, while Ventura received an aggregate term of 288 months' imprisonment. On appeal, the Defendants variously argue that (1) there was insufficient evidence to support their convictions, and that the district court erred in (2) failing to strike the special sentencing factors, (3) admitting certain co-conspirator statements, (4) instructing the jury, (5) investigating jury impartiality, and (6) imposing its sentence on Ventura. We disagree. We **DISMISS** for lack of jurisdiction Ventura's claim that the district court erred by refusing to downwardly depart when imposing his sentence and otherwise **AFFIRM** the judgments of the district court.

―――――――――

SAM A. SCHMIDT, Law Office of Sam A. Schmidt, New York, NY (Jillian S. Harrington, Law Office of Jillian S. Harrington, Monroe Township, NJ, *on the brief*), *for Defendant-Appellant Randy Torres.*

ANDREW FREIFELD, New York, NY, *for Defendant-Appellant Walston Owen.*

JOHN BURKE, Law Office of John Burke, Brooklyn, NY, *for Defendant-Appellant Charles Ventura.*

JACQUELINE KELLY, (David Abramowicz, *on the brief*), Assistant United States Attorneys, for Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

―――――――――

MARIA ARAÚJO KAHN, *Circuit Judge*:

Randy Torres, Walston Owen, and Charles Ventura (together, the "Defendants") appeal from judgments of the United States District Court for the Southern District of New York (Victor Marrero, *J.*) convicting them of numerous offenses arising out of their involvement in a violent street gang known as the Rollin' 30s Crips ("Rollin' 30s"). Following a thirteen-day jury trial, all three Defendants were convicted of racketeering conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Additionally, Owen and Ventura were each convicted of related firearms and assault offenses. Torres and Owens were sentenced to aggregate terms of 475 months' imprisonment, while Ventura received an aggregate term of 288 months' imprisonment.

On appeal, the Defendants variously argue[1] that (1) there was insufficient evidence to support their convictions, and that the district court erred in (2) failing to strike the special sentencing factors, (3) admitting certain co-conspirator statements, (4) instructing the jury, (5) investigating jury impartiality, and (6)

---

[1] Each Defendant also adopts all relevant appellate claims raised by his fellow Defendants. For the sake of clarity, this opinion will refer to each argument as being raised by the Defendant who briefed the issue.

3

imposing a sentence on Ventura. We reject each of these challenges. We **DISMISS** for lack of jurisdiction the portion of Ventura's appeal asserting that the district court erred by refusing to downwardly depart when imposing his sentence and otherwise **AFFIRM** the judgments of the district court.

## BACKGROUND

### I.   FACTS

According to the evidence adduced at trial, the Rollin' 30s are a subset of the national street gang known as the Crips. Within the Rollin' 30s are several subgroups, including the Harlem Mafia Crips, the Silent Murder Crips, the Certified Harlem Crips, and the Original Harlem Crips.

Torres was the highest-ranking member of the Rollin' 30s, controlling multiple subgroups of the gang throughout Brooklyn, the Bronx, Queens, and upstate New York. In this role, he supervised hundreds of other gang members and was empowered to, among other things, promote or demote members, collect dues, and enforce the gang's rules by ordering disciplinary violence. Owen sat directly below Torres in the Rollin' 30s hierarchy. He led a Rollin' 30s crew (known internally as a "lineup") based out of Stratford Avenue in the Bronx and administered orders to his subordinates regarding dues, disciplinary violence, and

4

day-to-day operations. Ventura served under Owen's command in the Stratford lineup. As a more senior member of the lineup, Ventura was authorized to direct the actions of his subordinates, including ordering them to inflict disciplinary violence against other, more junior members.

Torres, Owen, and Ventura separately directed and participated in multiple acts of violence in furtherance of the Rollin' 30s activities, including but not limited to the March 2015 murder of Victor Chafla, the June 2015 assault of Luchone Elzey, the September 2015 murder of Nestor Suazo, and the September 2017 shooting of Collin Bromwell.

### A. Murder of Victor Chafla

On March 26, 2015, Owen contacted a subordinate in the Stratford lineup, Richard Feliz, to inform him of the whereabouts of a rival gang member that Owen wanted Feliz and another Rollin' 30s member to shoot. In response to Owen's directive, Feliz retrieved a gun, traveled with Christopher Domena—later a cooperating witness—to Morrison Avenue, and shot at the rival gang member multiple times. The shots missed their intended target, instead striking and killing Victor Chafla, a bystander.

5

## B. Assault of Luchone Elzey

On June 10, 2015, Owen and other Rollin' 30s members assaulted and permanently disfigured Luchone Elzey, a member of another Crips subset. Video footage of the beating shows Owen kicking Elzey's head, with others joining in on the assault. At trial, cooperating witness Shaquille Bailey identified Owen in the surveillance footage, adding that Owen was present when another gang member slashed Elzey in the face.

## C. Murder of Nestor Suazo

By September 2015, the leaders of two subsets of the Rollin' 30s—the Harlem Mafia Crips, of which Owen and Ventura were part, and the Certified Harlem Crips—were embroiled in a dispute. Before that time, Torres led both groups, but his treatment and promotion of Nathaniel Rodriguez caused a rupture between the subsets.

On September 19, 2015, an altercation broke out between the Rollin' 30s subsets, during which Torres and another were stabbed by Nestor Suazo, a Certified Harlem Crips member. Suazo fled the fight to a nearby store. Torres followed Suazo into the store, punched Suazo in the face, and then left. After exiting, Torres met up with two Harlem Mafia Crips, including Derrick

Richardson. Shortly thereafter, Richardson shot and killed Suazo at the behest of Torres.

### D. Shooting of Collin Bromwell

On September 6, 2017, Ventura shot at a man he mistook for the leader of a rival gang, but was in fact Collin Bromwell, a member of the Silent Murder Crips, a subset of the Rollin' 30s. After the shooting, Ventura handed the gun to another individual at the scene before the two fled in different directions. Law enforcement later discovered Ventura's cellphone in the area where the shooting occurred.

## II. PROCEDURAL HISTORY

Ventura was initially indicted on January 16, 2018, and charged with possession of a firearm following a felony conviction as well as use of a firearm for attempted murder and assault, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (iii), and 2. All three Defendants, along with six other members of the Rollin' 30s, were later charged by superseding indictment with racketeering conspiracy, firearms offenses, and other related crimes.

Torres, Owen, and Ventura's joint jury trial began on February 4, 2020. During the government's presentation of its case, a juror ("Juror-1") approached

the district court to ask, *inter alia*, whether her name could be kept confidential. The district court informed Juror-1 that her name had already been made public at *voir dire*, and then questioned her about the basis for her inquiry as well as her ability to remain impartial. After considering her responses and the Defendants' request that she be struck from the jury, the district court determined that there was an insufficient basis for excusing Juror-1. Later, a second juror ("Juror-2") inquired about the district court's ability to keep the names of jurors confidential post-trial. The Defendants requested that the district court conduct individualized questioning of Juror-2, as it did for Juror-1, to ensure that she could remain impartial. The district court took the Defendants' motion under advisement and subsequently concluded that Juror-2 would neither be questioned nor struck.

On February 19, 2020, Torres moved to strike the notice of special sentencing factors from the indictment and the jury instructions on the basis that a violation of second-degree murder in New York could not qualify as a predicate racketeering act because that offense is more expansive than generic murder. The district court denied the motion after identifying other cases where the same argument was raised and rejected.

On February 24, 2020, the jury found the Defendants guilty on all seven counts. The jury also made findings as to the special sentencing factors related to Count One, namely that Suazo's murder was part of the pattern of racketeering activity Torres agreed to, and that Chafla's murder was part of the pattern of racketeering activity Owen agreed to.

Nearly a year after his conviction, in December 2020, Torres moved for a new trial pursuant to Federal Rule of Criminal Procedure 33. That motion was predicated on a post-sentencing affidavit by co-Defendant Emil Matute. At the Defendants' trial, former Rollin' 30s member and cooperating witness Nathaniel Rodriguez had testified about information that he learned from Matute concerning the circumstances and aftermath of Suazo's murder. In Matute's post-sentencing affidavit, however, he denied possessing personal knowledge of the information that he had conveyed to Rodriguez. Based on this affidavit, Torres asserted that Rodriguez's testimony concerning what he had learned from Matute was inadmissible and that, without this testimony, there was insufficient evidence to support the jury's finding as to the special sentencing factor. The district court denied Torres's motion, concluding that the evidence did not qualify as "newly discovered" because it was clear from Rodriguez's testimony that Matute may

9

have learned the information he conveyed from other co-conspirators. Suppl. App'x 149.

Prior to sentencing, Torres and Owen argued that the maximum term of imprisonment they should face for their racketeering conspiracy convictions was twenty years, as the offense outlined in each of their special sentencing factors was most analogous to voluntary manslaughter. The district court disagreed and determined that the most analogous offense for Guidelines purposes was second-degree murder under 18 U.S.C. § 1111. Thereafter, Torres and Owen were each sentenced to aggregate terms of 475 months' imprisonment. Ventura received an aggregate term of 288 months' imprisonment. This appeal followed.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

Torres and Owen raise three separate challenges to the sufficiency of the evidence supporting their convictions. First, Torres contends that there was insufficient evidence to support the jury's finding with respect to the special sentencing factor on Count One, disputing that the murder of a fellow Rollin' 30s member—albeit someone affiliated with another subset—was in furtherance of the Rollin' 30s RICO conspiracy. Second, Owen also contests the jury's finding with

10

respect to the special sentencing factor on Count One, arguing that there was insufficient evidence to prove that he aided and abetted the murder of Chafla. Third, Owen claims that his conviction for the assault of Elzey in aid of racketeering was not supported by sufficient evidence.

A challenge to the sufficiency of the evidence supporting a conviction is reviewed *de novo*. *See United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019). The movant "bears a heavy burden," as "the standard of review is exceedingly deferential." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)). In conducting our review, we "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id.* (quoting *Coplan*, 703 F.3d at 62). Furthermore, affirmance is appropriate "so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *Klein*, 913 F.3d at 78 (quoting *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006)).

**A. Special Sentencing Factor Finding Against Torres**

Torres argues that there was insufficient evidence to support the jury's finding that Suazo's murder was related to the activities of the enterprise because Suazo was also a member of the Rollin' 30s. This argument is without merit.

We have recognized that the predicate acts constituting the pattern of racketeering activity "must be related and amount to or pose a threat of continued criminal activity." *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010) (internal quotation marks omitted). The relatedness requirement takes two forms: "horizontal relatedness" and "vertical relatedness." *United States v. Cain*, 671 F.3d 271, 284–85 (2d Cir. 2012). Horizontal relatedness requires that the predicate acts be interrelated, whereas vertical relatedness requires that the predicate acts "have a nexus to the enterprise." *Id.* at 284. Torres's arguments relate to vertical relatedness.

To satisfy the vertical relatedness requirement, the government must adduce sufficient evidence "that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the

enterprise." *Reich v. Lopez*, 858 F.3d 55, 61 (2d Cir. 2017) (internal quotation marks omitted).

The government presented sufficient evidence to meet the vertical relatedness requirement. First, one cooperator, Domena, told jurors that Torres had the authority to order discipline against members of the Rollin' 30s and that such discipline could include the individual being killed. From this, the jury could reasonably infer that Torres was able to order Suazo's murder "solely because of his position in the enterprise." *Reich*, 858 F.3d at 61 (internal quotation marks omitted). Second, Rodriguez testified that Torres expressed his intention to "handle" the internal gang conflict before ordering a subordinate to retrieve the gun that was used to kill Suazo. Suppl. App'x 52, 58; *see also infra* Discussion Section III.A (addressing the admissibility of Rodriguez's testimony concerning what Matute conveyed to him). Because the indictment identifies "maintain[ing] discipline within the Enterprise" as one of the explicit purposes of the charged enterprise, Torres App'x at 39, Torres's order was necessarily "related to the activities of the enterprise." *Reich*, 858 F.3d at 61 (internal quotation marks omitted). Accordingly, we reject Torres's challenge to the special sentencing factor finding against him.

13

**B. Special Sentencing Factor Finding Against Owen**

Owen, too, contests that sufficient evidence supported the jury's finding with respect to the special sentencing factor, arguing that Domena's testimony was insufficient to support the inference that Owen ordered the shooting that resulted in Chafla's death. We are unpersuaded.

A criminal conviction "may be supported by the uncorroborated testimony of even a single accomplice . . . if that testimony is not incredible on its face." *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018) (quoting *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990)). However, arguments concerning a lack of corroboration are not grounds for reversal on appeal because "[a]ny lack of corroboration goes to the weight of the evidence, not to its sufficiency, and a challenge to the weight of the evidence is a matter for argument to the jury." *United States v. Gordon*, 987 F.2d 902, 906 (2d Cir. 1993).

Here, Owen's varied attacks on Domena's testimony go to lack of corroboration. For example, Owen asserts that the government did not call Feliz to testify directly about whether Owen ordered him to carry out the shooting that resulted in Chafla's death. Consequently, we find no basis for reversal and reject Owen's contentions.

**C. Assault in Aid of Racketeering Finding Against Owen**

Owen also contests the sufficiency of the evidence supporting his conviction for assault in aid of racketeering. To prove an assault in violation of the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute, the government must show, among other things, that the defendant: (1) assaulted someone resulting in serious bodily injury, *see* 18 U.S.C. § 1959(a)(3), and (2) committed that act "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity," *id.* § 1959(a).[2] Owen argues that the government failed to demonstrate that (1) he intended to cause serious physical injury to Luchone Elzey and (2) the assault was committed in aid of racketeering. We reject both arguments.

First, we conclude that there was sufficient evidence to prove that Owen intended to cause serious physical injury to Elzey. Count Four incorporates violations of N.Y. Penal Laws §§ 120.05 (Assault in the Second Degree) and 20.00 (Accomplice Liability) as the predicate state law violations. A person is guilty of second-degree assault under New York law when, "[w]ith intent to cause serious

---

[2] Here, the government alternatively charged an aiding-and-abetting theory of liability pursuant to 18 U.S.C. § 2, meaning it only needed to prove that Owen possessed the specific intent to facilitate or advance the Elzey assault. *See United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004).

physical injury to another person, he causes such injury to such person or to a third person." N.Y. Penal Law § 120.05(1). To establish accomplice liability under New York law, the government must show that the defendant "acted with the mental culpability necessary to commit the crimes charged and that, in furtherance thereof, he solicited, requested, commanded, importuned, or intentionally aided his alleged accomplices to commit such crimes." *People v. Lopez*, 27 N.Y.S.3d 639, 641 (2d Dep't 2016).

The evidence adduced at trial was sufficient to establish that Owen was guilty of second-degree assault. The government introduced video evidence showing Owen kicking Elzey in the face, with others joining in on the assault. A Rollin' 30s member known as "Flirm" then slashed Elzey in the face, leaving him permanently disfigured. Owen's violent participation in the beating provides a sufficient basis for a reasonable juror to infer that he intended to aid and abet the infliction of the serious physical injury that Elzey sustained. By joining the group that attacked Elzey, Owen "shared a community of purpose with them when [Elzey] was seriously injured" and "at the very minimum, was an accessory and, therefore, criminally liable for felony assault." *People v. Baugh*, 956 N.Y.S.2d 313, 316 (3d Dep't 2012) (internal quotation marks omitted); *see also People v. Francis*,

16

922 N.Y.S.2d 581, 583 (3d Dep't 2011) (affirming a conviction of assault in the second degree because the evidence established that the Defendant "actively joined in the attack").

We also conclude that sufficient evidence supports the finding that Owen committed the assault for the purpose of "maintaining or increasing [his] position" in the enterprise. 18 U.S.C. § 1959(a). That purpose requirement is "liberally" construed and "is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise." *United States v. White*, 7 F.4th 90, 101 (2d Cir. 2021) (internal quotation marks omitted). Here, co-conspirator testimony established that Elzey was considered an enemy of the Rollin' 30s enterprise. Indeed, Bailey testified that "it was basically open season" on Elzey. Owen App'x 88. We have no problem concluding that a reasonable jury could properly infer that attacking a known enemy was expected of Rollin' 30s members.

## II. CHALLENGE TO THE SPECIAL SENTENCING FACTORS

Torres argues that the district court erred in denying his motion to strike the notice of special sentencing factors from the indictment. He contends that the district court should have applied the categorical approach to determine whether

17

New York's second-degree murder statute, N.Y. Penal Law § 125.25(1), meets the generic definition of murder. Had the district court done so, he argues, it would have found that the statute is broader than the generic definition of murder and therefore cannot constitute a predicate racketeering act. Torres is mistaken; § 125.25(1) satisfies the generic definition of murder.

We review *de novo* the denial of a motion to dismiss charges in an indictment as well as the district court's resolution of questions of statutory interpretation. *See United States v. McCray*, 7 F.4th 40, 45 (2d Cir. 2021).

We first note that every circuit court that has considered the issue has concluded that the categorical approach should *not* be applied under these circumstances. *See United States v. Keene*, 955 F.3d 391, 392–93 (4th Cir. 2020); *Johnson v. United States*, 64 F.4th 715, 721 (6th Cir. 2023); *United States v. Brown*, 973 F.3d 667, 709 (7th Cir. 2020). Indeed, in rejecting Torres's position, the Sixth Circuit emphasized that "[n]o court has ever" required the application of the categorical approach to discern whether a state law predicate crime satisfies RICO's definition of racketeering activity. *Johnson*, 64 F.4th at 721. We need not reach this question here, however, as Torres's claim fails even if we assume *arguendo* that we must apply the categorical approach.

Under the categorical approach, we "compare the elements of the statute forming the basis of the defendant's [purported predicate offense] with the elements of the 'generic' crime." *Descamps v. United States*, 570 U.S. 254, 257 (2013). Applied to these circumstances, a state crime would only qualify as predicate racketeering activity "if the statute's elements are the same as, or narrower than, those of the generic offense." *Id.* Here, the purported predicate offense is second-degree murder under New York law. *See* 18 U.S.C. § 1961(1)(A) (defining racketeering activity as "any act or threat involving murder, . . . which is chargeable under State law and punishable by imprisonment for more than one year"). Accordingly, we compare the definition of murder under N.Y. Penal Law § 125.25(1) to the generic definition of murder.

The generic definition of an offense is derived from its "contemporary understanding." *United States v. Castillo*, 896 F.3d 141, 150 (2d Cir. 2018) (quoting *Taylor v. United States*, 495 U.S. 575, 593 (1990)). Courts may consider the common law and how the offense is defined by most states, in addition to relying upon "the federal criminal statutes, the Model Penal Code, scholarly treatises, and legal dictionaries." *Id.* (footnotes omitted). After surveying the Model Penal Code, dictionary definitions, and state laws, we conclude that generic murder is defined

19

as causing the death of another person intentionally, during the commission of a dangerous felony, or through conduct evincing reckless and depraved indifference to serious dangers posed to human life. *See United States v. Marrero*, 743 F.3d 389, 401 (3d Cir. 2014), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015).[3] Similarly, New York law defines second-degree murder as, *inter alia*, intentional murder, killing under circumstances that evince depraved indifference to life, and felony murder. *See* N.Y. Penal Law § 125.25(1)-(3). Accordingly, we conclude that second-degree murder under New York law is not broader than generic murder.

In arguing against that conclusion, Torres maintains that New York's second-degree murder statute is overbroad because it does not explicitly proscribe intentional murder with *malice aforethought*. But his emphasis on the absence of that phrase is misplaced. We recently explained that "malice aforethought" is a term of art that "became over time an arbitrary symbol used by judges to signify any of a number of mental states deemed sufficient to support liability for murder." *United States v. Capers*, 20 F.4th 105, 129 (2d Cir. 2021) (quoting Amer.

---

[3] We also join the Ninth Circuit in adopting this definition. *United States v. Vederoff*, 914 F.3d 1238, 1246–47 (9th Cir. 2019); *see also United States v. Castro-Gomez*, 792 F.3d 1216, 1216–17 (10th Cir. 2015) (citing to *Marrero* for the generic definition of murder).

Law Inst., Model Penal Code and Commentaries, § 210.2 cmt. 1 at 13-14). The "[f]irst and foremost" of those mental states was "intent to kill." *Id.* at 130 (quoting Amer. Law Inst., Model Penal Code and Commentaries, § 210.2 cmt. 1 at 14). Thus, even accepting Torres's premise that the categorical approach is required, second-degree murder under New York law qualifies as predicate racketeering activity and, consequently, the district court did not err in denying his motion to strike the special sentencing factor from the indictment.

III. ADMISSION OF CO-CONSPIRATOR STATEMENTS

Torres and Ventura separately challenge the district court's admission of four co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Torres contends that the district court erred in admitting (1) Rodriguez's testimony concerning what Matute conveyed to him about Suazo's murder; (2) Facebook messages between Rodriguez and an account named "Luis Lao"; and (3) Facebook messages between Feliz and an individual known as "Bkricc Lohc." Ventura argues that the district court abused its discretion in admitting a recorded jail conversation in which Bromwell identified Ventura as the person who shot him. The government disagrees that there was any error, let alone error sufficient to warrant a new trial.

We review evidentiary rulings by the district court under a deferential abuse of discretion standard, reversing only those determinations that are manifestly erroneous. *See United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019). Even if the district court's ruling was manifestly erroneous, the judgment will still be affirmed where the error was harmless. *See United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015). We consider four factors in assessing harmlessness: "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *Id.* at 127–28 (internal quotation marks omitted).

**A. Rodriguez's Testimony about Matute's Statements**

Torres contests the admission of Rodriguez's testimony regarding what Matute conveyed to him about Torres's participation in Suazo's murder on the basis that Matute lacked first-hand knowledge of Torres's role in the shooting. That contention is meritless. We conclude that the district court did not abuse its considerable discretion in admitting Rodriguez's testimony, and that even if it did, any error was harmless.

22

Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *Id.* However, the advisory committee's notes observe that the requirement set forth in Rule 602 does not extend to admissions[4]—including co-conspirator statements—admitted under Rule 801(d)(2):

> No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of truthworthiness in some against-interest circumstance, and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility.

Fed. R. Evid. 801(d)(2) advisory committee's note to 1972 proposed rules.

The advisory committee's notes also emphasize that Rule 801(d)(2) identifies five "categories of statements for which the responsibility of a party is considered sufficient to justify reception in evidence against him," including statements by a party's agent as well as co-conspirator statements. *Id.* This reflects

---

[4] In 2011, the advisory committee amended Rule 801 as part of a general "restyling" designed to make the Federal Rules of Evidence "more easily understood" and stylistically consistent. Fed. R. Evid. 801(d)(2) advisory committee's note to 2011 Amendments. Accordingly, statements admitted under Rule 801(d)(2) are no longer referred to as "admissions." *Id.* Despite this change in terminology, the advisory committee made clear that "[n]o change in application of [Rule 801] is intended." *Id.*

the fact that the co-conspirator exception to hearsay flows from the law of agency. *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002). As "partners in crime," *id.* (internal quotation marks omitted), each co-conspirator is deemed an agent of the others, and the "actions and utterances of either done in furtherance of that conspiracy are deemed authorized by the other," *id.* Accordingly, it follows that just as we do not demand personal knowledge for statements by a party's agent, *see United States v. Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003), we also do not require personal knowledge for co-conspirator statements.

Until now, the Second Circuit has not squarely addressed Rule 602's applicability to statements admitted pursuant to Rule 801(d)(2)(E). *See United States v. Ferguson*, 676 F.3d 260, 286 n.28 (2d Cir. 2011). In doing so here, we join our sister circuits that have considered the issue and concluded that co-conspirator statements are not subject to the personal knowledge requirement of Rule 602. *See United States v. Saccoccia*, 58 F.3d 754, 782 (1st Cir. 1995) (same); *United States v. Ammar*, 714 F.2d 238, 254 (3d Cir. 1983) (same); *United States v. Goins*, 11 F.3d 441, 443–444 (4th Cir. 1993) (same); *United States v. McLernon*, 746 F.2d 1098, 1106 (6th Cir. 1984) (same); *United States v. Lindemann*, 85 F.3d 1232, 1237–38 (7th Cir. 1996); *see also* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* §

801.34[2] (2d ed. 2024) (noting that, for co-conspirator statements under Rule 801(d)(2)(E), "[t]here is no requirement that the declarant be speaking from personal knowledge").

Given that Matute did not need to have personal knowledge of Suazo's murder for his statements to be admissible pursuant to Rule 801(d)(2)(E), the district court did not abuse its discretion in admitting Rodriguez's testimony concerning what Matute conveyed. Moreover, even if that were not the case, we would still conclude that any error in admitting Rodriguez's testimony was harmless, because the government adduced abundant independent evidence showing Torres's participation in the murder of Suazo.[5]

## B. Facebook Messages Between Rodriguez and "Luis Lao"

Next, Torres challenges the admission of Facebook messages exchanged between Rodriguez and an account with the name "Luis Lao," in which Lao identifies himself as a fellow member of the Crips and describes an incident wherein he and Torres robbed a rival gang member at gunpoint. Torres contends that the messages were improperly admitted because the government failed to

---

[5] The government's additional evidence included security footage showing Torres attack Suazo less than a minute before Suazo was shot and killed, Bailey's testimony that Torres told him that he had to fire on Suazo, and Rodriguez's testimony that Torres directly informed him that he was going to "handle the situation" shortly before Suazo's murder.

prove by a preponderance of the evidence who Lao is, the nature of any specific conspiratorial relationship between Lao and Torres, and how the proffered statements furthered the ends of that specific conspiracy.

Even accepting Torres's arguments that the district court abused its discretion in admitting the Facebook messages, he fails to demonstrate that the error was not harmless. The record is replete with other, more damning evidence linking Torres to the Rollin' 30s and the gang's violent activity, including surveillance footage of those activities and co-conspirator testimony. We therefore conclude that this evidence "did not substantially influence the jury." *United States v. Cummings*, 858 F.3d 763, 774 (2d Cir. 2017) (internal quotation marks omitted).

### C. Facebook Messages Between Richard Feliz and "Bkricc Lohc"

Third, Torres challenges the admission of Facebook messages exchanged by Feliz and an individual known as "Bkricc Lohc." In the messages, Feliz and Lohc—a member of the Rollin' 30s—expressed dismay at the internecine strife that culminated in Suazo's murder. Feliz recounted that "Star" was stabbed for defending Torres, and Lohc lamented, "STILL WHY KILL YA OWN BROTHER WE ALL THE SAME." Torres App'x 319. Torres argues that the exchange is nothing more than "idle chatter," which is not sufficient to satisfy the "in

26

furtherance" prong of the 801(d)(2)(E) analysis. We are not persuaded, however, that this supposed "idle chatter" contributed in any meaningful way to the jury's verdict. As previously noted, the government introduced significant evidence linking Torres to Suazo's murder. As such, we conclude that any error on the part of the district court in admitting the messages between Feliz and Lohc was harmless.

**D. Collin Bromwell Jail Call**

Finally, Ventura argues that the district court abused its discretion by admitting a recording of an October 22, 2017 jail call involving Bromwell—a member of the subset of the Rollin' 30s known as the Silent Murder Crips—and another individual named "Katchee." During the call, Bromwell described getting shot as well as his basis for believing that Ventura fired at him after mistaking Bromwell for rival gang leader Jadon Robinson. Ventura contends that the government failed to demonstrate by a preponderance of the evidence that he and Bromwell were co-conspirators and that the statements made during the jail call were in furtherance of their conspiratorial ends.

Again, even assuming the district court erred in admitting a recording of the Bromwell jail call, we conclude that the error was harmless. Surveillance footage

27

confirmed Ventura was in the area around the time of the shooting and showed him dropping a phone that police later recovered and traced back to him. Accordingly, we conclude that any error by the district court in admitting a recording of the jail call was harmless.

## IV. JURY INSTRUCTIONS

The Defendants raise several challenges to the jury instructions. Torres asserts that (1) the instruction on the special sentencing factor constructively amended the indictment; (2) the instruction on the special sentencing factor violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (3) the district court erred in refusing to instruct the jury on the affirmative defenses of extreme emotional disturbance and justification. Owen joins Torres in arguing that the instruction on the special sentencing factor constructively amended the indictment. Finally, Ventura contends that the district court did not offer a sufficient curative instruction to address the stricken testimony of Dr. Kara Storck.

Preserved challenges to the jury instructions are reviewed *de novo*. *See United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015). An instruction is erroneous "if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017)

28

(internal quotation marks omitted). Even if an instruction is erroneous, we will not vacate the conviction if the error was harmless. *See United States v. Skelos*, 988 F.3d 645, 654 (2d Cir. 2021).

**A. No Constructive Amendment**

Torres and Owen posit that the district court's instruction on the special sentencing factor constructively amended the indictment. According to them, the instruction should have required the jury to consider whether the government proved that Torres and Owen committed the murders referenced in their respective special sentencing factor. Instead, the government was only required to prove that the murders alleged were within the scope of the pattern of racketeering activity that each Defendant agreed would be committed.

To prevail on a constructive amendment challenge, a defendant "must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003). Torres and Owen have not made this showing.

At the outset, we note that Count One charges the Defendants with participation in a RICO conspiracy, in violation of 18 U.S.C. § 1962(d), not with a substantive violation of RICO or any other offense. A RICO conspiracy is distinct from "the *predicate acts* that may evidence the pattern" of racketeering activity. *United States v. Pizzonia*, 577 F.3d 455, 458 (2d Cir. 2009). To prove a RICO conspiracy, the government need not "establish that a pattern of racketeering activity actually took place." *United States v. Delgado*, 972 F.3d 63, 79 (2d Cir. 2020). Rather, it need only prove that a defendant agreed "with others to participate in the conduct of the affairs of the enterprise and agree[d] that the conduct of the affairs of the enterprise will include the predicate racketeering acts alleged." *United States v. Laurent*, 33 F.4th 63, 76 (2d Cir.), *cert. denied*, 143 S. Ct. 394 (2022).

The special sentencing factor at issue is rooted in § 1963(a), which provides for enhanced penalties for those found guilty of a RICO conspiracy "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment," 18 U.S.C. § 1963(a). In other words, the special sentencing factor merely identified a predicate act—the second-degree murders of Suazo and Chafla, which are punishable by life imprisonment—that each Defendant respectively agreed was part of the affairs of the enterprise. It did not otherwise

30

transform the RICO conspiracy charge into another offense. *See Capers*, 20 F.4th at 121. Thus, the district court did not amend the indictment by correctly instructing that, to find each Defendant guilty of the special sentencing factor, the jury had to conclude that the pattern of racketeering activity to which Torres and Owen agreed included the murder of Suazo and Chafla, respectively.[6]

## B.  No *Apprendi* Violation

Torres and Owen next contend that the instruction related to the special sentencing factor contravened *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which requires any fact—other than a prior conviction—"that increases the penalty for a crime beyond the prescribed statutory maximum . . . be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.  Both Defendants argue that the instruction on the special sentencing factor failed to require the jury to conclude that each Defendant committed second-degree murder under New York law. They further argue that the instruction erroneously asked jurors whether each

---

[6] Torres's reliance on *Delgado* is unavailing.  In *Delgado*, our reversal was compelled by the jury's specific finding that the Defendant did not aid and abet the two VICAR murders that also served as the basis for enhancing his RICO conspiracy conviction.  *See Delgado*, 972 F.3d at 79. Moreover, in that case, the propriety of the instruction that required the government to prove that the Defendant murdered the victims pursuant to N.Y. Penal Law § 125.25(1) was not in dispute. *See id.*  As such, *Delgado* does not undermine our conclusion here that the jury was correctly instructed, and that no constructive amendment occurred.

Defendant committed conspiracy to commit murder, an offense that does not qualify for an enhancement under § 1963(a) because it is not punishable by life imprisonment. We disagree.

The jury found that Torres and Owen agreed to participate in the affairs of the Rollin' 30s enterprise through a pattern of racketeering activity, which included the murder of Suazo and Chafla, respectively; not that the Defendants conspired to commit either murder. Accordingly, neither the jury instructions nor the Defendants' sentences ran afoul of *Apprendi*.

### C. No Error in Refusing to Instruct on Affirmative Defenses

Next, Torres contends that the district court erred in failing to instruct the jury on the affirmative defenses of justification and extreme emotional disturbance under New York law. Absent those instructions, he argues that "there can be no finding that Torres was convicted of a State offense." Torres's Br. 47.

Because Torres's crime of conviction was RICO conspiracy, not substantive RICO, the instructions accurately reflected the fact that the government bore no obligation to prove that Torres actually murdered Suazo under New York law. For that reason, the district court did not err in failing to instruct the jury on the affirmative defenses of justification and extreme emotional disturbance.

**D. Sufficient Curative Instruction Offered for Stricken Testimony**

Ventura asserts that the district court offered an insufficient curative instruction to address the stricken testimony of Dr. Storck, a medical examiner working for New York City. On direct examination, Dr. Storck was asked whether she had any involvement in the investigation other than conducting the autopsy of Suazo. She answered that she "testified previously in a criminal case for – criminal trial for this case." Ventura App'x 302. At this point, the defense requested a sidebar, wherein the government represented that it had anticipated the answer to that question would be "no." *Id.* at 303. The parties agreed that a curative instruction was needed but disagreed on the language that should be used.

Ventura's counsel requested an instruction indicating that Torres, Owen, and Ventura were not "involved in the prior trial." *Id.* at 304. The government objected, instead proposing that the district court strike the comment and inform the jurors that Dr. Storck's answer "is not to be considered." *Id.* at 305. The district court agreed with the government. Ventura's counsel proceeded to move for a mistrial, but the district court denied his motion. Then, the district court "ask[ed] the reporter to strike both the question that the government asked the witness and

the witness's answer" and instructed the jury that the "question and answer and that issue should not enter into your minds in any way." *Id.* at 309–10. On appeal, Ventura contends that the district court erred in failing to adopt the instruction proposed by trial counsel. We are not persuaded.

Where the district court offers a curative instruction following an inadmissible statement, this court presumes that the jury will heed the instruction "unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Jackson v. Conway*, 763 F.3d 115, 148 (2d Cir. 2014) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)). Ventura has not met this high bar.

Here, the district court promptly struck the testimony at issue and offered a curative instruction that the jury was not to consider the government's question nor Dr. Storck's answer. We see no basis for concluding that the jury was unable or unwilling to adhere to that clear instruction. *See United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008). What's more, the stricken testimony was not inflammatory such that it was very likely to have a devastating impact on Ventura. *See Jackson*, 763 F.3d at 148 (quoting *Greer*, 483 U.S. at 766 n.8). Consequently, we conclude

that the district court's response to Dr. Storck's testimony was not erroneous and did not deprive Ventura of a fair trial.

## V.   INVESTIGATION OF JURY IMPARTIALITY

Ventura posits that he was deprived of his right to a fair and impartial jury because of the district court's limited investigation into and decision not to remove two jurors who asked about their ability to remain anonymous after trial. Specifically, Ventura argues that the district court erred by not removing Juror-1 and deciding not to question Juror-2.

We review a district court's decision regarding juror impartiality for abuse of discretion. *See United States v. Peterson*, 385 F.3d 127, 134 (2d Cir. 2004). When credible allegations of juror bias are lodged at trial, the district court is obligated to investigate and, if necessary, address the issue. *See United States v. Haynes*, 729 F.3d 178, 191 (2d Cir. 2013). The district court enjoys "broad flexibility in such matters," *id.* at 192 (quoting *United States v. Thai*, 29 F.3d 785, 803 (2d Cir. 1994)), including with respect to "when to question jurors and the manner of that inquiry," *United States v. Ruggiero*, 928 F.2d 1289, 1301 (2d Cir. 1991). This broad discretion reflects the reality that any investigation is inherently intrusive and risks tainting the jury "by exaggerating the importance and impact of what may have

been an insignificant incident." *United States v. Abrams*, 137 F.3d 704, 708 (2d Cir. 1998) (per curiam). Accordingly, the district court is required not only to address impartiality issues, but also to avoid needlessly prejudicing the jury when doing so. *See United States v. Cox*, 324 F.3d 77, 88 (2d Cir. 2003).

The district court questioned Juror-1 directly and determined that Juror-1 suffered merely from a generalized fear of gang warfare and potential retaliation that is not uncommon in RICO cases. Furthermore, it explained that "she did not say that she could not be impartial." Ventura App'x 241. Because "[a]bsent evidence to the contrary, we presume that jurors remain true to their [sworn duties]," *United States v. Rosario*, 111 F.3d 293, 300 (2d Cir. 1997) (internal quotation marks omitted), we cannot conclude that the district court abused its discretion in not removing Juror-1.

We similarly conclude that the district court acted within the scope of its considerable discretion in addressing the concerns raised by Juror-2. The district court determined that Juror-2's inquiry and concern was identical to what was expressed by Juror-1. Consequently, it declined to question Juror-2 to avoid the risk of tainting the jury or magnifying the significance of a potentially

inconsequential question. *See Abrams*, 137 F.3d at 708. That decision was squarely in the district court's discretion. *See Ruggiero*, 928 F.2d at 1301.

## VI. CHALLENGES TO VENTURA'S SENTENCE

Ventura raises two separate challenges to his sentence. First, he asserts that the district court assessed an unconstitutional "trial penalty," lengthening his term of imprisonment as punishment for exercising his right to trial. Ventura Br. 28. Second, he contends that the district court erred in imposing his sentence because it misapprehended its authority to grant a downward departure pursuant to U.S.S.G. § 5K2.23. Both arguments are meritless.

### A. No Due Process Violation

Ventura posits that the disparity between the sentence range mentioned by the government in its plea offer, which Ventura rejected, and the sentence he received after exercising his Sixth Amendment trial rights constitutes a due process violation. We review *de novo* the district court's application of and adherence to constitutional due process standards. *See United States v. Cruz-Flores*, 56 F.3d 461, 463 (2d Cir. 1995).

The government's plea proposal reflected the "mutuality of advantage" that animates plea bargaining: Ventura would admit to a single offense and reduce his

sentencing exposure, while the government would be spared the time and expense of proving his guilt. *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (internal quotation marks omitted). To be sure, "more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights," but that is both "inevitable" and "permissible" in a criminal legal system that permits plea bargaining. *Id.* at 364 (internal quotation marks omitted). Ventura was not subjected to a trial penalty merely because he did not get to enjoy the benefits of the plea bargain that he rejected. *See United States v. Fernandez*, 104 F.4th 420, 428 (2d Cir. 2024) ("[O]ur system of pleas . . . often results in individuals who accept a plea bargain receiving shorter sentences than other individuals who are less morally culpable but take a chance and go to trial." (internal quotations omitted)); *see also United States v. Yeje-Cabrera*, 430 F.3d 1, 26–27 (1st Cir. 2005) ("A defendant simply has no right to a sentence, after trial, that is as lenient as a sentence he could have had earlier in a plea bargain.").

## B. Refusal to Downwardly Depart

Finally, Ventura contends that the district court misapprehended its authority to grant a downward departure pursuant to U.S.S.G. § 5K2.23 because it mistakenly believed Application Note 4 of U.S.S.G. § 2E1.1 precluded it from doing

so. Specifically, he suggests that the district court believed it could not grant a downward departure to credit him for a discharged sentence that he had served for a May 2009 conviction of criminal possession of a weapon in the second-degree, in violation of N.Y. Penal Law § 265.03. According to Ventura, that 2009 conviction was for conduct relevant to the RICO conspiracy charged in Count One. Therefore, because Ventura had served his term of imprisonment by the time he was sentenced for his conduct in the case at bar, he argues the district court should have credited his discharged prison term under § 5K2.23 just as it would an undischarged sentence under § 5G1.3. We disagree.

"As a general rule, a refusal to downwardly depart is . . . not appealable." *United States v. Young*, 910 F.3d 665, 674 n.39 (2d Cir. 2018) (alteration in original) (internal quotation marks omitted). However, we may review such a denial when the district misunderstood its authority to downwardly depart or the sentence was illegal for some other reason. *See id.* Absent "clear evidence of a substantial risk that the judge misapprehended the scope of his departure authority," we presume the district court accurately understood its authority. *United States v. Stinson*, 465 F.3d 113, 114 (2d Cir. 2006) (per curiam) (quoting *United States v. Gonzalez*, 281 F.3d 38, 42 (2d Cir. 2002)).

The record does not support Ventura's claim that the district court mistakenly believed Application Note 4 of § 2E1.1 precluded it from departing downward under § 5K2.23. Initially, the district court expressed its understanding that the Guidelines allow discharged sentences to be credited, though not in cases "where the previously imposed sentence occurred prior to the last overt act of the instant offense." Suppl. App'x 152. But the district court sought clarification on this point from the government, which explained that under the plain language of § 5K2.23, a downward departure for a discharged term is discretionary. The district court then exercised its discretion not to grant that departure.

Based on this record, we cannot conclude that there was clear evidence of a substantial risk that the district court misapprehended its authority to downwardly depart. Thus, we lack jurisdiction to review Ventura's challenge on this basis. *See Stinson*, 465 F.3d at 114; *see also United States v. Desena*, 260 F.3d 150, 159 (2d Cir. 2001).

## CONCLUSION

We have considered the parties' remaining arguments on appeal and conclude that they are without merit. For the reasons set forth above, we **DISMISS** for lack of jurisdiction Ventura's claim that the district court erred by

refusing to downwardly depart when imposing his sentence and otherwise

**AFFIRM** the judgments of the district court.